IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ERIC JONES,                          )
                                     )
            Plaintiff,               )
                                     )
     v.                              )          1:17CV863
                                     )
CHARTER COMMUNICATIONS               )
SHORT TERM DISABILITY PLAN,          )
                                     )
            Defendant.               )


**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

     Plaintiff Eric Jones ("Jones") brings this action pursuant

to 29 U.S.C. § 1132(a)(1)(B) of the Employee Retirement Income

Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., seeking this

court's review of a denial of short-term disability benefits.

(Complaint ("Compl.") (Doc. 1) ¶ 10.) Presently before this

court are cross-motions for summary judgment filed by Jones,

(Doc. 22),[1] and Defendant Charter Communications Short Term

Disability Plan (the "STD Plan"), (Doc. 23). Each party has

filed a brief in support of its motion. (Doc. 22-1 (Jones);[2] Doc.

_____

     [1] Though styled as a "Motion for Judgment," Jones moves
pursuant to Federal Rule of Civil Procedure 56, (see Doc. 22 at
1), and the court construes Jones's motion as one for summary
judgment.

     [2] Jones refiled his memorandum in support of his motion to
include a certificate of word count. (See Doc. 25.)

24 (STD Plan).) Defendant has responded to Plaintiff's motion, (Doc. 26), and the parties agree that this matter can be resolved on summary judgment, (see Doc. 10 at 2).[3] For the reasons that follow, Plaintiff's motion will be denied, and Defendant's motion will be granted.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.   The STD Plan

Jones is a former employee of Charter Communications, Inc. (together with Time Warner Cable ("TWC"), which Charter Communications acquired in 2016, "Charter"). Charter has an employee benefit program called the Charter/TWC Benefits Plan (the "Benefits Plan"). (See A.R. at 2459-91.)[4] The STD Plan is a self-funded component program of the Benefits Plan. (See A.R. at

---

[3] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

[4] Citations to the "A.R." refer to the Administrative Record filed by Defendant and the Bates numbers located at the bottom of the documents. (Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Br.") (Doc. 24), Ex. 1, Parts 1 to 20 (Docs. 24-1 to 24-20).)

2496-2501.)[5] As an employee, Jones was a beneficiary of the STD Plan.

The STD Plan provides eligible employees up to twenty-six weeks of short-term disability benefits, which cover a percentage of an eligible employee's compensation when he is unable to perform his job duties. (A.R. at 2497.) To receive short-term disability benefits, claimants must be "totally" or "partially" disabled, as defined by the STD Plan. (A.R. at

---

[5] The STD Plan asserted in its Answer that it is not a proper defendant because Sedgwick Claims Management Services, Inc. administers the STD Plan. (Def.'s Br. (Doc. 24) at 7; Answer (Doc. 4) at 5 (citing Gluth v. Wal-Mart Stores, Inc., No. 96-1307, 1997 WL 368625 (4th Cir. July 3, 1997)).) In Gluth, the Fourth Circuit found that a trust that was merely funding a benefits plan, with no administrative control, was an improper defendant. 1997 WL 368625, at *6. The Fourth Circuit, however, cited a Ninth Circuit case, Gelardi v. Pertec Comput. Corp., 761 F.2d 1323, 1324-25 (9th Cir. 1985), that said: "ERISA permits suits to recover benefits only against the employee benefits plan as an entity." Gluth, 1997 WL 368625, at *6 n.8 (citing Gelardi, 761 F.2d at 1324-25; Daniel v. Eaton Corp., 839 F.2d 263, 266 (6th Cir. 1988)). Given the court's ultimate disposition of Plaintiff's claim, the court will not endeavor to make a finding one way or the other, though it views the STD Plan as a proper defendant. See Larson v. United Healthcare Ins. Co., 723 F.3d 905, 916 (7th Cir. 2013) ("[A] claim for benefits ordinarily should be brought against the plan because the plan normally owes the benefits," except under an insurance-based ERISA plan where the insurer decides eligibility questions); see also McRae v. Rogosin Converters, Inc., 301 F. Supp. 2d 471, 475 (M.D.N.C. 2004) (citing Gluth, 1997 WL 368625, at *6) ("Although the Fourth Circuit has not published a decision that expressly holds who is a proper defendant . . . [it] appears to be aligned with those circuits that permit a plaintiff to bring an action . . . against the pension plan itself as an entity . . . .").

2499.) An employee is "totally disabled" if he "cannot perform the Essential Duties of [his] own occupation" and is "earning less than 20% of [his] pre-disability Covered Compensation due to an injury or illness (including Mental Illness . . . )." (<u>See</u> A.R. at 2499.) An employee is "partially disabled" if he is "able to work part-time for any employer performing some, but not all, of the Essential Duties of [his] own occupation" and "cannot earn more than 80% of [his] pre-disability Covered Compensation." (A.R. at 2499.) "Essential dut[ies]" are "the important tasks, functions and operations generally required by employers from those engaged in their usual occupation that cannot be reasonably omitted or modified." (A.R. at 2505.) A grant of short-term disability benefits lasts until the earliest of the date a beneficiary is no longer disabled, his failure to furnish satisfactory proof of continued disability, or the exhaustion of his twenty-six weeks of short-term disability benefits. (<u>See</u> A.R. at 2498-99.)

A third party may administer the Benefits or STD Plans. The Benefits Plan defines the "Administrator" as the "Committee" and, in turn, the "Committee" as at least three members appointed by Charter and receiving no compensation for such services. (A.R. at 2463, 2476.) Importantly, the Committee has:

> [T]otal and exclusive responsibility to control, operate, manage, and administer the [Benefits] Plan in

accordance with its terms. The Committee shall have
the authority that may be necessary or helpful to
enable it to discharge its responsibilities with
respect to the [Benefits] Plan. Without limiting the
generality of the preceding sentence, the Committee,
or its delegate, if any, shall have the exclusive
right to interpret the [Benefits] Plan, to determine
eligibility for coverage under the [Benefits] Plan, to
determine eligibility for benefits under the
[Benefits] Plan, to construe any ambiguous provision
of the [Benefits] Plan, to correct any default, to
supply any omission, to reconcile any inconsistency,
and to decide any and all questions arising in
administration, interpretation, and application of the
[Benefits] Plan.

(A.R. at 2476.) The Committee's decisions, as well as those by

the Claims Administrator, are conclusive and binding. (A.R. at

2476, 2478.) And the Committee's authority does not extend to

"any matter as to which a Claims Administrator or another

designated party under any Component Program is empowered to

make determinations." (A.R. at 2477.)

The Committee "delegated its authority to determine

benefits under the [Benefits] Plan to the Claim Administrators."

(A.R. at 2476.) The STD Plan then provides that the Claims

Administrator "is the claims fiduciary with sole authority to

determine benefit claims under the terms of the [STD Plan]."

(A.R. at 2501.) The STD Plan allows the Claims Administrator to

request that an employee receiving short-term disability

benefits be examined to verify continued disability and to

request that a beneficiary provide it with "other satisfactory

proof of [the beneficiary's] continued disability." (A.R. at 2499; see also A.R. at 2502.)[6] Finally, the STD Plan provides that any appeal of a denied claim will be reviewed by the Claims Administrator and conducted by a person not involved in the initial determination. (See A.R. at 2503.)

Charter partnered with Sedgwick Claims Management Services, Inc. ("Sedgwick") to administer the STD Plan. (A.R. at 2508.)[7]

**B.** **Jones's Mental Illness and the Short-Term Disability Benefits at Issue**

Jones was a Customer Care Rep I ("CSP 1") at Charter, (A.R. at 1900-01), providing "customer sales and service support by telephone for the high-speed data broadband product, digital phone and cable television[,]" (A.R. at 1410). His job responsibilities included interacting with customers and coworkers positively and empathetically, performing mathematical calculations, providing expertise on products and services, problem solving, and other sedentary tasks. (A.R. at 2402-06.)

---

[6] This court is unclear as to which party pays for verification examinations. (Compare A.R. at 2499 (stating that they are at the Claims Administrator's expense), with A.R. at 2502 (stating that periodic reexaminations are at the beneficiary's expense).)

[7] The Administrative Record contains no written agreement between the STD Plan and Sedgwick, and Sedgwick is not defined as the Claims Administrator, but it is clear to the court, and the parties do not argue otherwise, that Sedgwick is the Claims Administrator under the STD Plan.

Jones's job required concentration, stable mood, multitasking, and the ability to handle high call volume. (A.R. at 116-17.)

Jones has a history of mental health issues, stemming in part from a traumatic burn he suffered as a child. (See A.R. at 1426, 1431.) He has received therapy since he was young and started taking medications in 1999. (A.R. at 117.) Jones was diagnosed with bipolar disorder in 2008. (A.R. at 117.)

Jones first applied for short-term disability benefits under the STD Plan on or around May 18, 2015, due to psychiatric issues, including his bipolar disorder. (A.R. at 4, 9.) His treating physician at the time, Dr. M. Chan Badger, noted in a June 3, 2015 attending physician statement that Jones was "not stable to perform his current job functions." (A.R. at 9-10.) In the attending physician statement, Dr. Badger noted a projected return to work date of August 18, 2015. (A.R. at 10.) Sedgwick ultimately approved Jones's claim for short-term disability benefits through August 9, 2015, and Jones returned to work on or around August 10, 2015. (See A.R. at 11, 36.)

In late 2015, Jones switched medical providers and began seeing Dr. Chris Aiken and Nurse Practitioner Sara Robertson ("N.P. Robertson") at the Mood Treatment Center. (A.R. at 1499.) Jones first visited the Mood Treatment Center on December 17, 2015, and N.P. Robertson diagnosed him with bipolar type II

disorder, obsessive-compulsive disorder ("OCD"), attention-deficit/hyperactivity disorder ("ADHD"), remissive cocaine use, and also noted post-traumatic stress disorder ("PTSD"). (1499-1508.) Jones regularly received treatment at the Mood Treatment Center over the following months, including on December 30, 2015, (A.R. at 1498); January 14, 2016, (A.R. at 1495); February 19, 2016, (A.R. at 1492); March 10, 2016, (A.R. at 1489); March 24, 2016, (A.R. at 1486); and May 5, 2016, (A.R. at 1483).

Jones's treatment continued through the summer of 2016. Jones saw N.P. Robertson on July 20, 2016. (A.R. at 1480-83.) N.P. Robertson's psychiatric progress notes from that visit, signed by Dr. Aiken, indicate that Jones endorsed high-to-moderate depressed mood, mild problems with concentration, anxiety, and no suicidal ideations. (A.R. at 1481.) Jones reported feeling well four of the previous seven days. (A.R. at 1482.) The notes also state that Jones was "[u]nhappy at his job – wants to do PR work." (A.R. at 1481.) The notes do not indicate whether Jones was unable to perform any job functions, (see A.R. at 1480-83), but state that his "judgment may be impaired depending on the task/setting[,]" (A.R. at 1483).

On August 17, 2016, Jones applied for the short-term disability benefits relevant here. (A.R. at 1689-94.) On

August 19, 2016, Jones saw N.P. Robertson. (A.R. at 1478-80.)
Her psychiatric progress notes from that visit, signed by Dr.
Aiken, indicate that Jones was depressed, anxious, and had
developed mild insomnia since his last visit on July 20, 2016.
(See A.R. at 1478-80.) Jones endorsed high-to-moderate depressed
mood, anxiety, concentration problems, and he denied suicidal
ideations; N.P Robertson again noted Jones's bipolar disorder,
PTSD, OCD, ADHD, and remissive cocaine use. (A.R. at 1478-80.)
Jones reported feeling well zero of the previous seven days and
wanted to go on short-term disability. (A.R. at 1478-79.) The
notes do not indicate that Jones was unable to perform any job
functions and state that Jones had no functional impairment from
his depression. (See A.R. at 1478-80.) N.P. Robertson continued
Jones's current medications. (A.R. at 1480.)

Shortly thereafter, on August 26, 2016, Dr. Aiken and N.P.
Robertson indicated in a statement of incapacity/attending
physician statement ("SOI") that Jones was incapacitated until
September 22, 2016, due to his bipolar type II disorder, PTSD,
and ADHD. (A.R. at 1646.) The SOI also indicates that Jones had
visited the emergency room at Novant Health. (A.R. at 1647.) The
Mood Treatment Center appears to have faxed this SOI to Sedgwick
on August 29, 2016 and September 8, 2016. (A.R. at 1645-46.) On
September 6, 2016, Sedgwick approved Jones's short-term

disability benefits from August 22, 2016 through September 6, 2016, effective after an elimination period of August 22, 2016 to August 28, 2016. (A.R. at 1662-63.)

On September 6, 2016, Jones visited N.P. Robertson, who noted that Jones's mood had improved. (A.R. at 1474.) N.P. Robertson's notes state that Jones endorsed very mild symptoms of depressed mood, anxiety, and problems with concentration. (A.R. at 1474.) Jones reported feeling well five of the seven previous days and had no suicidal or impulsive thoughts. (A.R. at 1474-75.) N.P. Robertson did not indicate whether Jones was unable to perform his job functions. (See A.R. at 1474-75.)

Thereafter, in an SOI dated September 26, 2016, Dr. Aiken indicated that Jones was unable to perform his job functions due to his condition. (A.R. at 1627.) Dr. Aiken recommended that Jones not return to work until October 25, 2016, because of his bipolar type II disorder, PTSD, ADHD, as well as four panic attacks in the prior month. (A.R. at 1627-28.) Attached to the SOI was a September 26, 2016 "summary of disability" form in which N.P. Robertson and Dr. Aiken specifically noted that they had advised Jones to stop working. (A.R. at 1630-31.) They noted Jones's full impairment in certain of his job functions, including the inability to: "maintain a work pace appropriate to a given workload"; "perform complex or varied tasks"; "make

generalizations, evaluations or decisions"; and "relate to other people beyond giving and receiving instructions." (A.R. at 1631-32.) The Mood Treatment Center faxed the SOI and disability summary to Sedgwick on September 26, 2016. (A.R. at 1624-32.)

On September 29, 2016, a Sedgwick employee reviewed Jones's file and recommended extending Jones's short-term disability benefits until October 21, 2016, based on an expected return-to-work date of October 25, 2016. (A.R. at 1144-45.) Sedgwick's internal documentation summarizes the approval rationale and notes that Jones needed "additional time for symptoms to stabilize prior to [return to work] as a CSP 1." (A.R. at 359.) On September 30, 2016, Sedgwick extended Jones's short-term disability benefits through October 21, 2016. (A.R. at 1620.)

On October 12, 2016, Dr. Aiken and Jones spoke on the phone regarding Jones's treatment and response to his medications. (A.R. at 1472-73.) Dr. Aiken's notes of that call do not indicate whether Jones was unable to perform his job duties. (See A.R. at 1472-73.) On October 21, 2016, Jones visited N.P. Robertson. (A.R. at 1469-71.) Her notes, signed by Dr. Aiken, indicate that Jones's mood had improved, that he felt well six of the prior seven days, and suggest no functional impairment. (See A.R. at 1469-71.) Jones still exhibited mild symptoms of depressed mood, hypoactivity, concentration problems, and

anxiety. (A.R. at 1469.) But he showed no signs of psychosis or suicidal thoughts. (A.R. at 1469-71.) The notes state that Jones "had 2 interviews – on STD – extended 1 more month." (A.R. at 1469.) The notes also indicate that Jones would see a new therapist, Ms. Barbara Farran, ASCW, LCSW. (See A.R. at 1469.) N.P. Robertson did not indicate whether Jones was unable to perform his job duties. (See A.R at 1469-71.)

Sedgwick attempted to call Jones on October 15, 2016 before his grant of short-term disability benefits expired on October 21, 2016. (A.R. at 340.) Sedgwick did not immediately cut Jones's benefits off on October 21st. Sedgwick attempted to contact Dr. Aiken's office to get an update on Jones's condition. On October 26, 2016, Sedgwick spoke with Jones and told him that no updated information had been received from the Mood Treatment Center. (A.R. at 352.) On October 27, 2016, Sedgwick faxed the Mood Treatment Center requesting updated medical information on Jones and again called Jones. (A.R. at 340, 350.) On October 28, 2016, the Mood Treatment Center faxed Sedgwick Jones's updated medical records, including a list of current medications and the notes from Jones's October 12, 2016 telephone conference and October 21, 2016 office visit. (See A.R. at 346-48; 1598-1608.) A Sedgwick form document requesting medical information was also filled out by someone at the Mood

Treatment Center and indicates that Jones's next treatment was
on November 18, 2016 and that his estimated return to work date
was November 25, 2016. (A.R. at 1599.)

Sedgwick spoke to Jones on November 1, 2016 and advised him
that it was reviewing the additional information from the Mood
Treatment Center. (See A.R. at 343-44.) On November 2, 2016,
after reviewing the additional office visit notes, Sedgwick left
a voicemail with the Mood Treatment Center seeking to clarify
"what provider saw on exam that is preventing [employee] from
working, examples how those symptoms were observed to be severe,
and if [employee] could [return to work] with restrictions."
(A.R. at 1776.) Sedgwick left another voicemail with Dr. Aiken
and N.P. Robertson on November 3, 2016. (A.R. at 1776.) The
voicemails apparently went unreturned. Later that day,
November 3, 2016, one of Sedgwick's registered nurses reviewed
Jones's file, including Dr. Aiken's notes from his October 12,
2016 telephone conference with Jones, N.P. Robertson's
psychiatric notes from Jones's October 21, 2016 treatment, and
Jones's medication list. (See A.R. at 1775.) Sedgwick's nurse
concluded that Jones's "[m]edical information does not support
severity that [he] is disabled still because exam findings are
minimal and do not indicate that [he] has a cognitive
impairment." (A.R. at 1776.) The nurse was unable to tell

whether Dr. Aiken and N.P. Robertson had cleared Jones to return
to work as there was "no visible indication that [he] need[ed]
more time off of work[,]" and it looked to the nurse as if
Jones's symptoms were more in control and his mood had improved.
(A.R. at 342, 1776.)

For those reasons, on November 3, 2016, Sedgwick denied a
continuation of Jones's short-term disability benefits,
effective October 22, 2016, and notified Jones in writing. (A.R.
at 315, 1463-65.) Sedgwick's denial letter states that it had
"received medical information from Dr. [sic] Sara Robertson &
Dr. Chris Aiken on 09/26/2016, which confirmed [Jones's]
disability through 10/21/2016. The determination to deny an
extension of benefits is based on a review of medical
documentation provided by Amanda Kirby [sic] & Dr. Badger [sic]
on 10/28/2016." (A.R. at 1464.)[8] The letter continues that those
records did not "support severity of disability due to exam
findings being minimal and do not indicate that the [employee]
has a cognitive impairment. Attempts to gather additional
information were unsuccessful." (A.R. at 1464.)

---

[8] Sedgwick mistakenly referenced Dr. Badger and Ms. Kirby
(Jones's previous therapist). Sedgwick later explained to Jones
between November 8 and 9, 2016, that the documentation it
received on October 28, 2016, and reviewed prior to denying
continuation of his benefits was from the Mood Treatment Center,
had an e-signature from Dr. Aiken, and only mentioned Ms. Kirby
as another provider. (See A.R. at 324-28.)

On November 4, 2016, Dr. Aiken faxed Jones's medical records to Sedgwick, with an "urgent" notation. (A.R. at 1587-88.) These documents included the October 12, 2016 and October 21, 2016 psychiatric progress notes, (A.R. at 1587-95), which Sedgwick had already reviewed after Dr. Aiken sent them on October 28th, (A.R. at 1598-1608). Jones also called Sedgwick several times between November 4, 2016 and November 9, 2016 to dispute the denial. (A.R. at 325-26, 332-36.)

### C.  The Administrative Appeal

On November 10, 2016, Jones appealed Sedgwick's denial through a faxed letter dated November 9, 2016, from Dr. Aiken to Sedgwick's National Appeals Unit. (A.R. at 1461-62, 1466 (STD Appeal Form signed by Jones on November 7, 2016).) Dr. Aiken requested that Sedgwick reconsider its denial because Jones's medical condition "impair[ed] his ability to work in any capacity." (A.R. at 1462.) In his cover letter, Dr. Aiken reiterated that Dr. Badger and Ms. Kirby were "not affiliated with Mood Treatment Center" in any way. (A.R. at 1462.) Dr. Aiken provided Jones's psychiatric progress notes from December 17, 2015 through October 21, 2016. (A.R. at 1461-1508.)

On November 15, 2016, Sedgwick's Appeals Unit notified Jones of its receipt of his appeal, which Sedgwick assigned to Appeals Specialist Tricia Pike. (A.R. at 1457-58.) On

November 17, 2016, Sedgwick contacted Jones to explain the appeal process and told him that an independent physician would review Jones's file and contact N.P. Robertson and Ms. Farran to discuss Jones's medical issues. (A.R. at 309-12.) Jones stated that no other providers needed to be contacted. (See A.R. at 310.) Sedgwick told Jones which medical documents it currently had for review, including the Mood Treatment Center's notes from August 19, 2016 and September 16, 2016, as well as the associated SOI from September 26, 2016, and notes from Jones's October 12, 2016 telephone conference with Dr. Aiken and his October 21, 2016 office visit. (A.R. at 310.) Jones told Sedgwick that there would be additional information submitted from a forthcoming treatment on November 18, 2016, and possibly information from Ms. Farran. (See A.R. at 310-11.) On November 17, 2016, Sedgwick tolled Jones's appeal through November 30, 2016, to allow Jones time to perfect his appeal. (A.R. at 309-11, 1434).

On November 18, 2016, Jones saw N.P. Robertson. (A.R. at 1432.) Her psychiatric progress notes from that visit, signed by Dr. Aiken, state that Jones's short-term disability benefits were denied and that Jones was now extremely depressed, "[t]earful, not sleeping, [and] hopeless." (A.R. at 1430-32.) Jones reported feeling well zero of the prior seven days, and

N.P. Robertson noted "passive suicidal thoughts without plan/intent (low-moderate)." (A.R. at 1430-31.) The notes describe Jones's mental status as "[m]arkedly ill, with functional impairment from symptoms," and judgment impairment depending on the task or setting. (A.R. at 1431-32.) The notes do not specifically indicate that Jones was unable to perform his job functions. (See A.R. at 1431-32.) N.P. Robertson increased Jones's dosage of Klonopin due to his anxiety. (A.R. at 1432.)

On or around November 28, 2016, Sedgwick received N.P. Robertson's notes from the November 18, 2016 visit and Jones's updated prescription list. (A.R. at 299-04, 1427-32.) On November 30, 2016, Ms. Pike left a voicemail with the Mood Treatment Center, asking if more time was needed to submit additional information. (A.R. at 299.) Thereafter, Sedgwick tolled Jones's appeal through December 18, 2016. (A.R. at 1423.)[9]

On December 5, 2016, Ms. Farran faxed Sedgwick a letter stating that she had been seeing Jones since October 27, 2016. (A.R. at 1424-26.) Ms. Farran's diagnosis was for PTSD "based on

_____

[9] Ms. Pike informed Jones incorrectly on December 9, 2016 that Sedgwick was still missing the November 18, 2016 visit notes, (A.R. at 292-93), which misbelief might have caused this tolling, (see A.R. at 665-66). By December 13, 2016, Ms. Pike had informed Jones that Sedgwick did have the November 18th notes. (A.R. at 288-89.)

[Jones's] trauma of being a burn victim, a former Marine, and the subsequent bullying he encountered," (A.R. at 1426), but she did not opine on his disability status.

On December 13, 2016, Jones told Sedgwick that, if the November 18, 2016 documents included the information "about the hopelessness, suicidal tendencies and significant increase in Klonopin dosage," then his file was complete. (A.R. at 1748-49.) Later that day, Ms. Pike referred Jones's appeal to an independent physician for review ("IPA review"). (A.R. at 1748.) The referred file included Sedgwick's November 3, 2016 denial letter, Dr. Aiken's November 9, 2016 appeal letter with the supporting medical records from December 2015 through October 2016, N.P. Robertson's November 18, 2016 office visit notes and Jones's prescription list, Jones's job description, and all "juris notes." (A.R. at 1748-49.) In her referral for IPA review, Ms. Pike specifically requested that a specialist in psychiatry conduct the review. (A.R. at 1748.)

Dr. Patrick Young, a board-certified psychiatrist retained through Dane Street LLC, conducted the review of Jones's appeal and his file, including: Sedgwick's internal file and communications with Jones; Jones's job description; Dr. Aiken's November 9, 2016 appeal letter; Jones's medical records from the Mood Treatment Center, including the psychiatric notes from

December 2015 through November 18, 2016, and the SOIs from August 26, 2016 and September 26, 2016; Ms. Farran's December 5, 2016 letter; and other miscellaneous records and correspondence. (See A.R. at 1408.) As part of his review, Dr. Young conducted a peer-to-peer phone discussion on December 20, 2016 with N.P. Robertson. (A.R. at 274-75, 1408-09.) N.P. Robertson told Dr. Young that she saw Jones on October 21, 2016 and November 18, 2016. (A.R. at 275-76.) She said Jones was doing reasonably well and improving on October 21st but had gotten more depressed by November 18th. (A.R. at 276.) N.P. Robertson did not change Jones's medications after the October 21, 2016 visit, and she only increased his Klonopin dosage after the November 18, 2016 visit. (A.R. at 276, 1410.)[10] N.P. Robertson told Dr. Young that she was unsure if Jones's change in mood related to the denial of his short-term disability benefits. (A.R. at 276.) N.P. Robertson could not identify what specific impairments Jones had that would have caused an inability to function. (A.R. at 276, 1410.) Dr. Young also requested peer-to-peer discussion with Jones's therapist, Ms. Farran, who declined to opine on Jones's

---

[10] Dr. Young's review documentation refers to another anxiety drug, Clonazepam. (A.R. at 1410.) The Mood Treatment Center's documents refer to Klonopin. (A.R. at 2399.) It appears to this court that Clonazepam is the generic form of the brand-name drug Klonopin.

disability status because she was not qualified to make those determinations. (A.R. at 275-78, 1410.)

Dr. Young concluded in his IPA review that Jones was not impaired from October 22, 2016. (A.R. at 1413.) He noted the SOI from September 26, 2016, which clearly indicated that Jones was unable to perform any of his job functions and that he had experienced four panic attacks in a month. (A.R. at 1411.) Dr. Young also relied on the notes from Jones's October 21, 2016 visit, where N.P. Robertson noted mild symptoms and an improved mood and did not indicate that Jones was impaired as of that date. (A.R. at 1413.)

Dr. Young's review states that Jones got worse by November 18, 2016, but Dr. Young felt that the decline was "directly related to his disability denial." (A.R. at 1413.)[11] Jones's "[m]ental status exam showed depressed mood, constricted affect, low tone speech, negative thought content and impaired judgment . . . and passive suicidal thoughts." (A.R. at 1411.) Nevertheless, the November 18th notes revealed "normal thought

---

[11] The court notes that Dr. Young wrote in his review that "the treating provider said in the [November 18th] note" that Jones's increase in depression "was related to his denial of disability." (A.R. at 1414.) While the conclusion that Dr. Young drew from N.P. Robertson's note is reasonable, her note states that Jones had been "[d]enied for short term disability & pt is appealing. Extremely depressed . . . ." (A.R. at 1430.) That is, it does not explicitly state that Sedgwick's denial caused Jones's increased depression.

process and content." (A.R. at 1414.) Dr. Young found that, even on November 18, 2016, when Jones was extremely depressed, Jones had "no issues with cognition, and was able to think clearly." (A.R. at 1413.) While Jones did express some suicidal ideations at the November 18th treatment, "he was not considered suicidal, as no plan of action was taken." (A.R. at 1413.) The only change to Jones's prescriptions was an increased dosage of Klonopin. (A.R. at 1413.) To Dr. Young, the "findings for the days in question [did] not support impairment." (A.R. at 1413.)

On December 22, 2016, Sedgwick received Dr. Young's IPA review upholding the denial of Jones's short-term disability benefits. (A.R. at 645.) Sedgwick's internal documentation notes that Dr. Young's rationale was that "[t]here [was] no clear clinical documentation submitted for review that is found to be supportive of any continued condition of disability or resulting functional impairment of any severity to support disability from their job as a CSP 1." (A.R. at 645.) And "[t]here were no medical findings associated with any abnormality and no evidence of functional impairment that would support disability." (A.R. at 645.) Sedgwick's internal review of Dr. Young's rationale noted that Sedgwick agreed with the decision due to a "lack of objective clinical findings." (A.R. at 270.)

On December 28, 2016, Sedgwick denied Jones's administrative appeal. (A.R. at 1403-05.) Sedgwick's denial letter states that Sedgwick's Appeals Unit had reviewed medical records from Dr. Aiken, N.P. Robertson, and Ms. Farran, dated December 17, 2015 through December 5, 2016. (A.R. at 1404.)[12] The denial letter provides that Jones's file was reviewed by an independent specialist, Dr. Young, a board-certified psychiatrist. (A.R. at 1404.) The letter continues that Dr. Young had performed a comprehensive review of the available medical documentation, received a message from Ms. Farran on December 19, 2016, and spoken with N.P. Robertson on December 20, 2016. (A.R. at 1404.) The denial letter recounts Dr. Young's conversation with N.P. Robertson on December 20, 2016, during which N.P. Robertson said that Jones was doing reasonably well on October 21, 2016, and that a few weeks later, during a November 18, 2016 treatment visit, Jones "had gotten more depressed and anxious, however, the remainder of the exam was unremarkable." (A.R. at 1404.) The denial letter states that Jones's "symptoms were mild during [his] October visit and although [his] symptoms worsened during [his] November visit, this appeared to be related to [Jones's] disability denial as

_____

[12] The letter states December 17, 2016 through December 5, 2016, an obvious error.

there were no issues noted with cognition or [his] ability to think clearly." (A.R. at 1404.) Further, Dr. Young found during his review "that the medical information provided [did not] support impairment for the dates in question." (A.R. at 1404.) The denial letter concludes: "[a]s the medical information in the file does not support your inability to perform your own occupation, as defined by the [STD] Plan . . . , we have no alternative other than to reaffirm the denial of benefits for the period of October 22, 2016 to your return to work." (A.R. at 1404.)

**D.** **Subsequent History**

Jones visited the Mood Treatment Center on January 5, 2017, and, on January 6, 2017, Sedgwick received N.P. Robertson's clearance for Jones to return to work on January 6th. (A.R. at 495, 1402.) The relevant period for Jones's claim, therefore, is October 22, 2016 through January 5, 2017.

It appears that Jones returned to work on January 7, 2017, went back out on January 10th, returned on January 14th, (A.R. at 1827), and again requested short-term disability benefits on or around January 10, 2017. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") (Doc. 22-1) at 6; see A.R. at 264.)

Jones initiated care with a new psychiatrist, Dr. Subedi, on or around January 19, 2017. (A.R. at 483.) In support of

Jones's January claim for short-term disability benefits, Dr.
Subedi submitted an SOI dated February 2, 2017, (A.R. at 1380-
82), and later submitted one dated April 4, 2017, (A.R. at 1335-
37). In the February 2nd SOI, Dr. Subedi noted Jones's inability
to multi-task, interact appropriately with others, concentrate
on tasks, and Jones's incapacitation from January 19, 2017
through March 13, 2017. (A.R. at 1381-82.) Dr. Subedi later
extended that incapacitation until April 14, 2017. (A.R. at
1335.) In late January and early February 2017, Jones also
participated in a partial hospitalization program. (A.R. at
625.)

On or around March 20, 2017, a registered nurse at Sedgwick
reviewed Jones's claim, including the SOI from February 2, 2017,
and noted Jones's bipolar disorder, poor concentration,
psychiatric treatment, and that his "sedentary occupation []
does require concentration, stable mood, and ability to
multitask high volume of calls." (A.R. at 1720-21.) On March 21,
2017, Sedgwick approved Jones's short-term disability benefits
through March 31, 2017, (A.R. at 1719-1720), later extending
them until April 16, 2017. (A.R. at 2430.) Jones returned to
work on or around April 17, 2017, (A.R. at 453), but his

employment with Charter was then terminated, effective May 30, 2017, (A.R. at 2422).[13]

Jones filed this lawsuit on September 27, 2017, pursuant to 29 U.S.C. § 1132(a)(1)(B), seeking reversal of Sedgwick's denial of his short-term disability benefits from October 22, 2016 through January 5, 2017, and a declaration from this court that he is entitled to those benefits. (See Compl. (Doc. 1) at 1, 3; Pl.'s Br. (Doc. 22-1) at 13.) In the alternative, Jones asks this court to remand his claim for a "full and fair review." (Compl. (Doc. 1) ¶ 10.)

## II. <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986). This court's summary judgment inquiry is whether the evidence "is so one-sided that one party must prevail as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986). The moving party bears the initial burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp.</u>, 477 U.S. at 325. If the "moving party discharges

_____

[13] The Complaint appears to mistakenly allege that Jones was employed by Charter until August 2016. (Compl. (Doc. 1) ¶ 5.)

its burden . . . , the nonmoving party must come forward with
specific facts showing that there is a genuine issue for trial."
McLean v. Patten Cmtys., Inc., 332 F.3d 714, 718-19 (4th Cir.
2003) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574, 586-87 (1986)). Summary judgment should be granted
"unless a reasonable jury could return a verdict for the
nonmoving party on the evidence presented." McLean, 332 F.3d at
719 (citing Liberty Lobby, 477 U.S. at 247-48).

When facing cross-motions for summary judgment, this court
reviews "each motion separately on its own merits to determine
whether either of the parties deserves judgment as a matter of
law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003)
(citations and internal quotation marks omitted). "When
considering each individual motion, the court must take care to
resolve all factual disputes and any competing, rational
inferences in the light most favorable to the party opposing
that motion." Id. (citation and internal quotation marks
omitted).

When reviewing a claims administrator's determination of
eligibility for benefits under ERISA, the standard that this
court applies depends on whether the claims administrator is
vested with discretion in making the determination. If it is
not, then this court reviews the claim administrator's decision

de novo. <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115

(1989). If it is, then this court reviews the decision "for

abuse of discretion, and [this court] will not disturb such a

decision if it is reasonable." <u>Booth v. Wal-Mart Stores, Inc.</u>

<u>Assocs. Health & Welfare Plan</u>, 201 F.3d 335, 342 (4th Cir. 2000)

(certain citations omitted) (citing <u>Firestone Tire & Rubber Co.</u>,

489 U.S. at 111). A claims administrator's decision is

reasonable when it is the result of a "deliberate, principled,

reasoning process and [is] supported by substantial evidence."

<u>Williams v. Metro. Life Ins. Co.</u>, 609 F.3d 622, 630 (4th Cir.

2010) (citations and internal quotation marks omitted).

When analyzing the reasonableness of a claim

administrator's denial of benefits, courts in the Fourth Circuit

generally consider some of the following factors:

> (1) the language of the plan; (2) the purposes and
> goals of the plan; (3) the adequacy of the materials
> considered to make the decision and the degree to
> which they support it; (4) whether the fiduciary's
> interpretation was consistent with other provisions in
> the plan and with earlier interpretations of the plan;
> (5) whether the decisionmaking process was reasoned
> and principled; (6) whether the decision was
> consistent with the procedural and substantive
> requirements of ERISA; (7) any external standard
> relevant to the exercise of discretion; and (8) the
> fiduciary's motives and any conflict of interest it
> may have.

<u>Booth</u>, 201 F.3d at 342-43.

Finally, this court generally limits its consideration of evidence to the administrative record. Helton v. AT & T Inc., 709 F.3d 343, 352 (4th Cir. 2013) (citations omitted). But the more specific and pertinent consideration is of the evidence within the administrative record that was known to the claims administrator when it rendered its decision. See id. With these principles in mind, this court turns to Sedgwick's denial of Jones's short-term disability benefits from October 22, 2016 through January 5, 2017.

## III. ANALYSIS

### A.   Abuse of Discretion Standard is Applicable

Taken together, the language of the STD and Benefits Plans grants Sedgwick the sole discretion to determine eligibility for short-term disability benefits.

The language of the Benefits Plan grants the Committee, or its delegate, the exclusive right to interpret the Benefits Plan and to determine eligibility for benefits thereunder. The Committee, whose decisions are final and binding, delegated its authority to the Claims Administrators generally under the Benefits Plan. Under the STD Plan specifically, a component program of the Benefits Plan, the Claims Administrator has sole authority to decide claims for short-term disability benefits. And it is evident to this court that Charter partnered with

Sedgwick to administer the STD Plan, i.e., to be the Claims Administrator for the STD Plan. And the parties agree. (See Pl.'s Br. (Doc. 22-1) at 7; Def.'s Br. (Doc. 24) at 5.) In addition, the fact that Sedgwick is responsible for reviewing and managing appeals of claim denials further evidences its discretion with respect to eligibility determinations. See Starnes v. Gen. Elec. Co., 201 F. Supp. 2d 549, 556 (M.D.N.C. 2002).

Relatedly, Sedgwick serves as a third-party claims fiduciary free of any conflict of interest. Charter self-funds its Plan, and Sedgwick "does not act as an insurer of the Plan; therefore, neither it nor the doctor[] it retained had any direct financial stake in the determination of [the beneficiary's] eligibility." Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co., 32 F.3d 120, 126 (4th Cir. 1994); (see A.R. at 1414-15 (Dr. Young's attestation to no conflict of interest)). Sedgwick had no conflict of interest or any ulterior motive influencing its determination. That Booth factor, therefore, does not weigh in favor of finding Sedgwick's denial unreasonable. See Booth, 201 F.3d at 343.

**B.    Denial was Supported by Substantial Evidence**

This court has little trouble finding that Sedgwick reviewed an adequate universe of documents. Sedgwick ensured

that it had up-to-date medical records at each step of its review process. Most importantly, it verified that it had up-to-date medical records prior to denying Jones's claim on November 3, 2016, and upholding that decision on December 28, 2016. Sedgwick specifically indicated which documents it had reviewed in its November 3, 2016 letter and which documents Dr. Young and Sedgwick had reviewed in its December 28, 2016 letter. This court's review of the administrative record suggests, and this court finds, that Sedgwick based its determination on an adequate consideration of all relevant materials obtained at its own effort and provided to it by Jones and his medical providers. Further, that universe of documents substantially supports Sedgwick's determinations.

Sedgwick's September 6, 2016 grant of short term-disability benefits was supported by the August 26, 2016 SOI, in which Dr. Aiken and N.P. Robertson clearly provided that Jones was unable to perform his job functions until September 22, 2016, due to his bipolar type II disorder, PTSD, and ADHD. That SOI also states that Jones had visited the emergency room at Novant Health. By so indicating, the SOI made up for the fact that the August 19, 2016 office visit notes, while noting that Jones felt well zero of the prior seven days, do not indicate that Jones was unable to perform any job functions.

The same is true of Sedgwick's extension of Jones's short-term disability benefits on September 30, 2016. The September 26, 2016 SOI clearly indicates what the September 6, 2016 office visit notes do not – that Jones was unable to perform his job functions. Although Dr. Aiken did not identify specific job functions Jones was unable to perform, he did note that Jones's four panic attacks in the prior month prevented him from completing basic tasks, and he indicated an expected return-to-work date of October 25, 2016. In addition, attached to that SOI was a summary-of-disability form, in which Dr. Aiken and N.P. Robertson noted that they had advised Jones to stop working. In that form, Jones's providers wrote that Jones was fully impaired in his ability to maintain an appropriate work pace, perform complex tasks, relate to others, make decisions without supervision, and influence people.

Sedgwick denied Jones's short-term disability benefits on November 3, 2016, after undertaking to obtain Jones's most recent medical records. On October 28, 2016, before making its decision, Sedgwick received Dr. Aiken's notes from his October 12, 2016 telephone conference with Jones and the notes from Jones's October 21, 2016 visit to the Mood Treatment Center. Sedgwick determined that those notes – which do not indicate Jones's inability to perform his job functions and were not

accompanied by an SOI – did not support a finding of continued disability. The October 21st office visit notes indicate that Jones's mood had improved and that he felt well six of the seven prior days. Jones was coherent, experiencing very mild depression, and alert and oriented. N.P. Robertson only indicated that Jones's judgment "may be impaired depending on the task/setting." (A.R. at 1471.) When Sedgwick attempted to gather further information as to what Jones's providers saw that would support continued disability, it was unable to do so. Therefore, Sedgwick denied continuation of Jones's short-term disability benefits shortly after Jones failed to furnish satisfactory proof of continued disability, as it has the discretion to do under the STD Plan.

While Sedgwick's denial letter to Jones contains an obvious error – i.e., that Dr. Badger and Ms. Kirby provided the updated records to Sedgwick – this court finds that Sedgwick considered the proper documents from the Mood Treatment Center before denying Jones's claim (and advised Jones of the same). See Judge v. Metro. Life Ins. Co., 710 F.3d 651, 658-60 (6th Cir. 2013) (collecting cases) (finding administrator's "recital of an incorrect standard of 'total disability' in its initial denial letter," later corrected upon review, harmless error when documentation evidencing disability was insufficient throughout

the administrative-review process). Even though Sedgwick's attempts to contact the Mood Treatment Center after reviewing Jones's medical records were unsuccessful, the record is clear that Sedgwick had Jones's most up-to-date medical records as of November 3, 2016. Sedgwick therefore had the documents necessary to make a determination and did in fact properly consider those records when it denied Jones's benefits. The court therefore finds that Sedgwick's November 3rd denial of Jones's short-term disability benefits, effective October 21, 2016, was based on adequate materials that substantially support Sedgwick's discretionary determination.

As to Dr. Young's IPA review, it is clear to this court that Dr. Young reviewed adequate materials, and Sedgwick's decision to uphold the denial was supported by substantial evidence. Dr. Young reviewed Jones's job description; Dr. Aiken's appeal letter; the Mood Treatment Center's psychiatric progress notes from December 17, 2015 through November 18, 2016; the August 26, 2016 SOI; and the September 26, 2016 SOI and the attached form summarizing Jones's disability. He also reviewed Sedgwick's communications with Jones and his providers from August 18, 2016 through December 5, 2016; correspondence from Ms. Farran; Sedgwick's "juris notes"; and miscellaneous documents. (A.R. at 1408.) For many of the same reasons that the

court finds Sedgwick's initial denial reasonable, the court finds that Dr. Young's conclusion, and Sedgwick's denial of Jones's appeal on December 28, 2016 reasonable. Two facts, however, warrant additional discussion.

First, in his November 9, 2016 appeal letter, Dr. Aiken wrote: "Eric Jones has a medical condition which currently impairs his ability to work in any capacity." (A.R. at 1462.) Second, Jones's condition had deteriorated by the time of his November 18, 2016 office visit, as N.P. Robertson's notes reflect. Dr. Young reviewed both Dr. Aiken's appeal letter and N.P. Robertson's notes from Jones's November 18, 2016 office visit.

Jones points to Dr. Aiken's November 9, 2016 appeal letter in arguing that Dr. Aiken "continued to opine several times after October 21, 2016 that Plaintiff was disabled and unable to work, including submitting an appeal . . . on his behalf." (Pl.'s Br. (Doc. 22-1) at 9.) This court does not find that Dr. Aiken "continued to opine several times" that Jones was disabled and unable to work as argued by Jones. In fact, it appears that Dr. Aiken's opinions were limited to his cover letter to Jones's appeal and perhaps in signing off on N.P. Robertson's November 18, 2016 patient notes. But when Dr. Young conducted a peer-to-peer discussion with N.P. Robertson, she could not tell

Dr. Young whether Jones was unable to perform his job duties or what specific impairments would cause, or would have caused at the time, an inability to perform his job functions. In the absence of evidence that Dr. Aiken had information over and above that which was available through N.P. Robertson, the facts support a conclusion that Dr. Young's recommendation was not inconsistent with the opinions of Jones's own providers. (Ms. Farran declined to opine on Jones's disability status.)

Even so, as Defendant argues, ERISA "do[es] not command plan administrators to credit the opinions of treating physicians over other evidence relevant to the claimant's medical condition." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003); see also Matos v. Lorillard Tobacco Co. Grp. Disability Ins. Plan, 391 F. Supp. 2d 392, 400 (M.D.N.C. 2005) (citing Nord, 538 U.S. at 834) ("[It is] clearly established that no treating physician rule exists in ERISA cases."). The Fourth Circuit has been equally clear that a claims administrator does not abuse its discretion when it credits a retained, independent, reviewing physician's recommendation that disagrees with a beneficiary's medical provider. See, e.g., Booth, 201 F.3d at 345 (citing Elliott v. Sara Lee Corp., 190 F.3d 601, 606 (4th Cir. 1999); Ellis v. Metro. Life Ins., 126 F.3d 228, 234 (4th Cir. 1997)) (reversing

district court and finding no abuse of discretion by
administrative committee where evidence from two treating
providers conflicted with the opinions of two reviewing
physicians).

Second, Jones argues that "Plaintiff's condition continued
to deteriorate after the October 21, 2016 denial." (Pl.'s Br.
(Doc. 22-1) at 9.) Pointing to the November 18, 2016 office
visit note, which indicates that Jones was extremely depressed
and had some functional impairment, Jones argues that Dr. Young
offered no support for the "blanket and generic statement" that
he believed Jones's symptoms were caused by Sedgwick's denial of
short-term disability benefits. (Id.) Defendant argues that Dr.
Young's conclusion was supported by Jones's "self-proclaimed
hatred of working at Charter." (Def.'s Resp. in Opp'n to Pl.'s
Mot. for Summ. J. ("Def.'s Resp.") (Doc. 26) at 11; see also
A.R. at 1500, 1506.) It is apparent from this record that Jones
was unhappy at Charter and interviewing for other jobs. (See,
e.g., A.R. at 1469, 1481, 1489.) But the court declines to
credit Defendant's argument because there is no indication that
Dr. Young or Sedgwick took that fact into consideration in
reaching their respective recommendation or determinations.
Nevertheless, Dr. Young's conclusion regarding Jones's
deterioration was reasonable.

The November 18, 2016 office visit note does not
specifically indicate an inability to perform job functions and
was not followed by an SOI clearly stating Jones's disability,
in marked contrast to the August and September office visits,
which were followed by SOIs which in turn supported Sedgwick's
decisions to grant the short-term disability benefits. While the
November 18, 2016 notes state that Jones was "[m]arkedly ill,
with functional impairment from symptoms[,]" (A.R. at 1431), Dr.
Young found that the note also shows Jones's "normal thought
process and content[,]" (A.R. at 1414). In addition, Dr. Young
appears to have inferred from the fact that N.P. Robertson did
not change Jones's medication, except for an increase to his
Klonopin dosage, that Jones's symptoms were under control.
Further, the court finds it a fair inference that Dr. Young drew
from the content of the November 18, 2016 note, as well as the
timing of Jones's deterioration, that Jones's symptoms related
to the benefits denial. Dr. Young's peer-to-peer discussion with
N.P. Robertson did not diminish Dr. Young's suspicion in that
regard, specifically because of N.P. Robertson's inability to
tell Dr. Young that Jones's deterioration was unrelated to
Sedgwick's denial.

Taking into consideration the peer-to-peer discussion that
Dr. Young initiated, the court does not find Dr. Young's

conclusion unreasonable. Even if contradictory to the November 18, 2016 note (which the court does not find), the court again notes that "it is not an abuse of discretion for a plan fiduciary to deny benefits where conflicting medical reports were presented." Booth, 201 F.3d at 345 (alterations, citations, and internal quotation marks omitted).

That Sedgwick chose to rely on Dr. Young's conclusion that Jones was not disabled rather than Dr. Aiken's opinion (voiced only once) is not an abuse of discretion. The court finds that Sedgwick's denial is supported by substantial evidence.

## C.  **Charter did not Abuse its Discretion**

Jones argues specifically that Charter abused its discretion in two ways: (i) by not engaging in a reasoned and principled review process, (Pl.'s Br. (Doc. 22-1) at 8-11), and (ii) by failing to request that Jones attend an "Independent Medical Examination," (id. at 11-13). The court will consider each in turn.

### 1.  **Reasoned and Principled Decision-making Process**

Jones's fundamental argument as to the reasonableness of Sedgwick's decision-making process is that it was inconsistent. (See Pl.'s Br. (Doc. 22-1) at 8-11.) That is, because Sedgwick approved Jones's short-term disability benefits from August 22, 2016 through October 21, 2016, and then again beginning on or

around January 10, 2017, it was unreasonable to deny them in the interim absent evidence that Jones's disability had ceased. (Id. at 9.)

The administrative record contradicts Jones's assertion that Sedgwick's decision-making process was inconsistent; rather, Sedgwick's decision-making process was consistent – it granted Jones's claims when supported by an SOI satisfactorily indicating Jones's disability on September 6, 2016, September 30, 2016, and March 20, 2017, and denied his claim on November 3, 2016 when not supported by an SOI or any other satisfactory proof of continued disability. Jones argues that the "most glaring" of Defendant's failures to engage in a principled review is that Sedgwick denied Jones's claim from October 22, 2016 through January 5, 2017 and then granted his claim again on March 20, 2017, effective on or around January 10, 2017, based on the "exact same diagnoses, symptoms, and limitations" as before. (Id. at 10.) But the March 20, 2017 grant was supported by Dr. Subedi's SOI, and Jones ignores the fact that, in late January and early February 2017, he participated in a partial hospitalization program, during which time he "would not able to fulfill the work required" of him, as Sedgwick explicitly noted in its review. (A.R. at 625.) The limitations on Jones's ability to work were not, in fact, the

exact same. His condition had rapidly deteriorated, perhaps best evidenced by the fact that his own provider, N.P. Robertson had just cleared Jones to return to work without restriction on January 6, 2017. Further, as Defendant suggests, (Def.'s Resp. (Doc. 26) at 10-11), if Sedgwick's subsequent grant of benefits contributed to an abuse-of-discretion finding by this court, claims administrators might be faced with the perverse decision to deny a claim for consistency reasons and in an effort to avoid having a grant used against them at a later time. This court, therefore, finds that Sedgwick engaged in a reasoned and principled decision-making process in denying continuation of Jones's short-term disability benefits. Nevertheless, the court will briefly address Jones's cited authority.

Jones relies primarily on another district court's unpublished opinion, Thomas v. Alcoa Inc., for the proposition that a claim administrator's inconsistent eligibility determinations indicate an abuse of discretion. (Pl.'s Br. (Doc. 22-1) at 8-11 (citing Thomas, Civil Action No. RDB-07-1670, 2008

WL 4164156, at *10 (D. Md. Sept. 5, 2008)).[14] This court does not find Thomas persuasive.

In Thomas, the district court found that Alcoa's denial of a beneficiary's long-term disability benefits was not the result of a deliberate and principled review process where Alcoa had granted the benefits two years earlier. See 2008 WL 4164156, at *9, *15. In Thomas, the district court's conclusion depended on several factors not present here. Most significantly, the court found that plaintiff's employer, Alcoa, was both the benefit plan's administrator and insurer, meaning that Alcoa had a financial stake in the eligibility decision that it made. Id. at *8. The court, therefore, applied a less-deferential modified abuse-of-discretion standard applicable to conflicted administrators, id. at *10, which might have caused the court to

---

[14] Plaintiff also cites Anderson v. Reliance Standard Life Insurance Co., Civil No. WDQ-11-1188, 2013 WL 1190782 (D. Md. Mar. 21, 2013), in arguing that a denial without "new medical information to justify that decision [should be treated with] significant skepticism." (Pl.'s Br. (Doc. 22-1) at 8 (quoting Anderson, 2013 WL 1190782, at *9).) The district court in that case cited two out-of-circuit and unreported cases for that proposition, and Jones selectively quotes the court, which limited that skepticism to the "termination of long term disability benefits . . . ." Anderson, 2013 WL 1109782, at *9 n.26 (citations omitted). Sedgwick terminated Jones's short-term disability benefits. Further, the district court in Anderson continued, as Jones acknowledges, (Pl.'s Br. (Doc. 22-1) at 8), that "the Fourth Circuit has stated that the administrator need not show a change in condition to justify a termination of benefits." Anderson, 2013 WL 1190782, at *9 & n.27 (citations omitted). This court does not find Anderson persuasive.

find the denial unreasonable on its own, see id. at *15 ("The administrator could only have reached this peculiar result by a selective and incomplete review of the record – a review that was likely distorted by Alcoa's motivations to reduce the expense to its bottom line."). The court in Thomas actually double counted the conflict of interest by applying the less-deferential standard of review and finding that the conflict, as an independent Booth factor in the reasonableness analysis, weighed against a finding that the denial was reasonable. Id. at *9.[15] Neither fact is present here.

Further, while Alcoa retained ultimate discretionary authority for eligibility determinations, Alcoa employed a third-party administrator to make an initial eligibility determination. Thomas, 2008 WL 4164156, at *9. Alcoa replaced the third-party administrator that initially granted plaintiff's disability benefits and, shortly thereafter, the new third-party administrator denied them. Id. at *10. The timing and

---

[15] In light of the Supreme Court's decision in Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105 (2008), decided shortly before Thomas, the district court's double counting and application of a modified abuse-of-discretion standard was perhaps improper. See Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 358 (4th Cir. 2008) (citations omitted) ("[A]fter Glenn, . . . courts are to apply simply the abuse-of-discretion standard . . . even if the administrator operated under a conflict of interest. . . . And any conflict of interest is considered as one factor, among many, in determining the reasonableness of the discretionary determination.").

circumstances of that replacement in Alcoa's review process
"further stoke[d] th[e] Court's suspicion." Id. at *9-10.
Finally, the eligibility reversal was not supported by
substantial evidence considering plaintiff's "undeniable
deterioration" in the interim between the approval and denial.
Id. at *10-11 (noting physician statement that, "[t]he thought
that [plaintiff] could do any type of repetitive actions or even
work again in the future with all of [his] issues is absolutely
unheard of"; noting another physician's statement that the
third-party administrator's "distasteful report . . . has the
appearance of being contrived to circumvent or obscure the
obvious and create artificial and inappropriate barriers to the
ultimate and inescapable conclusion that [plaintiff is]
irrefutably 100% disabled"). Ultimately, the district court
found it "impossible . . . to ascertain how Alcoa reached its
eligibility decision . . . or what evidence it relied upon." Id.
at *12.

This court has already found that Sedgwick is not
conflicted and has sole discretion to make eligibility
determinations. Therefore, Sedgwick's role does not weigh
against a finding of reasonableness as it did (twice) in Thomas.
In addition, Sedgwick was the third-party administrator
throughout the relevant time here. This court has also found

that Sedgwick's decision was supported by substantial evidence,
the most relevant of which was N.P. Robertson's notes from
October 21, 2016 indicating Jones's improvement – not an
undeniable deterioration as in Thomas. While Jones's condition
had worsened by November 18, 2016, Dr. Young found that Jones's
increase in depression was related to his disability denial;
whereas, in Thomas, the beneficiary's deterioration occurred
after a grant and before a denial. Id. at *15.

     This court also notes that Sedgwick's appeals specialist,
Ms. Pike, specifically sought out a psychiatrist to review
Jones's denial, evincing a principled approach by Sedgwick in
reviewing the merits of Jones's appeal. See Gluth, 1997 WL
368625, at *5 (finding that seeking out and obtaining an opinion
from a medical professional with specific and relevant
experience "evince[d] a principled approach").

     It is well settled "that no vested right to benefits
accrues under an employee welfare benefit plan absent a clearly
stated obligation to this effect in the plan's policies."
Webster v. Black & Decker (U.S.) Inc., 33 F. App'x 69, 75 (4th
Cir. 2002) (citing Gable v. Sweetheart Cup Co., Inc., 35 F.3d
851, 855 (4th Cir. 1994)). Here, the Benefits Plan provides that
"[t]he benefits under the Plan and the Component Programs [e.g.,
the STD Plan] are not vested benefits, and in no event shall any

person have any vested rights with respect thereto." (A.R. at 2486.) Sedgwick's denials of Jones's short-term disability benefits on November 3, 2016, and his appeal on December 28, 2016 were the result of a reasoned and principled decision-making process.

### 2. Independent Medical Examination Not Required

Jones's other argument is that Sedgwick abused its discretion by failing to request an independent medical examination. (Pl.'s Br. (Doc. 22-1) at 11-13.) Jones relies almost exclusively on another district court's decision in Zhou v. Metropolitan Life Insurance Co. for the proposition that, "[w]here a claimant suffers from a disability condition encompassing subjective complaints, an independent medical examination is appropriate." (Pl.'s Br. (Doc. 22-1) at 11 (quoting Zhou, 807 F. Supp. 2d 458, 471 (D. Md. 2011).) Yet, Plaintiff concedes that neither Defendant nor Sedgwick was obligated to request an independent medical examination. (See Pl.'s Br. (Doc. 22-1) at 11.)[16] Nevertheless, Sedgwick upheld the

---

[16] Nor does the law provide a per se rule requiring a claims administrator to conduct an independent medical examination before denying benefits, as Defendant argues. (See Def.'s Resp. (Doc. 26) at 14 (certain citation omitted) (citing Piepenhagen v. Old Dominion Freight Line, Inc. Emp. Benefit Plan, 640 F. Supp. 2d 778, 792 (W.D. Va. 2009)).)

denial here based in part on a "lack of objective clinical findings," (A.R. at 270), and, under these circumstances, the court's decision in <u>Zhou</u> does suggest an examination is appropriate, <u>see</u> 807 F. Supp. 2d at 474. A brief discussion, therefore, is warranted.

The court in <u>Zhou</u> found it "inappropriate" for the defendant to deny the plaintiff's long-term disability claim "based solely on the opinions of psychiatrists who merely reviewed Plaintiff's file, to the exclusion of statements and diagnoses by Plaintiff's treating physicians, and without an independent medical examination supporting the view of [the claims administrator's] psychiatrists." <u>Id.</u> at 474. The court in <u>Zhou</u> then cited to non-binding decisions as examples of courts holding that an independent medical examination is appropriate "where the claimant suffers from a disability condition encompassing subjective complaints[,]" such as depression. <u>Id.</u> (citing <u>Smith v. Cont'l Cas. Co.</u>, 450 F.3d 253, 263-64 (6th Cir. 2006); <u>Schwarzwaelder v. Merrill Lynch & Co.</u>, 606 F. Supp. 2d 546, 560 (W.D. Pa. 2009); <u>Zanny v. Kellogg Co.</u>, No. 4:05-CV-74, 2006 WL 1851236, at *9 (W.D. Mich. June 30, 2006)).

Plaintiff again overlooks that <u>Zhou</u> involved a conflicted administrator, one serving as both the insurer and administrator of the long-term disability plan at issue. <u>Zhou</u>, 807 F. Supp. 2d

at 470. In Thomas, which Jones also relies upon heavily in his other argument, the court wrote that, "[w]hile independent examinations are not required, they are common in ERISA cases, and courts are wary of conflicted administrators who deny benefits without utilizing them." 2008 WL 4164156, at *11 (emphasis added) (citing Laser v. Provident Life & Accident Ins. Co., 211 F. Supp. 2d 645, 649-50 (D. Md. 2002) (applying modified abuse-of-discretion standard); Watson v. UnumProvident Corp., 185 F. Supp. 2d 579, 581-82 (D. Md. 2002) (weighing conflict and applying less deferential standard of review)).[17] Again, Sedgwick has no conflict when making its eligibility determinations under the STD Plan.

In addition, the eligibility determinations at issue in Thomas and Zhou, and the cases cited therein, usually involved the denial of long-term disability benefits, not short-term disability benefits. See Zhou, 807 F. Supp. 2d at 473; Thomas, 2008 WL 4164156, at *1; Laser, 211 F. Supp. 2d at 647; Watson, 185 F. Supp. 2d at 581; Schwarzwaelder, 606 F. Supp. 2d at 548;

---

[17] The district court's review in Zanny was actually de novo because the plan language did not grant the claims administrator discretionary authority in making eligibility determinations. 2006 WL 1851236, at *1, *9. The district court there also found that the administrator "regularly reviewed the client's file with an open intention to deny benefits despite profound and compelling evidence of serious and prolonged mental illness." Id. at *9. Sedgwick acted with no such intention here.

<u>Zanny</u>, 2006 WL 1851236, at *1.[18] A plan administrator's decision to order an independent medical examination in the context of a claim for long-term disability benefits involves different cost-analyses and standard-of-care considerations than those involved in a claim for short-term disability benefits.

Here, unlike in <u>Zhou</u>, Jones's own medical records failed to establish his disability, and Dr. Young's peer-to-peer discussion with N.P. Robertson confirmed Dr. Young's recommendation. Sedgwick fully and fairly considered the medical opinions and diagnoses of Jones's treating physicians. There was not satisfactory information available to support incapacity at the time of Sedgwick's November 3, 2016 denial or during the appeal process. Dr. Young made the effort to discuss Jones's treatment with his providers. Any inference of continued impairment that could have been gleaned from the November 18, 2016 medical records had to be discounted after Dr. Young's peer-to-peer discussion with N.P. Robertson. Sedgwick exercised its discretion in not requesting an independent medical

---

[18] The Sixth Circuit's decision in <u>Smith</u> involved a denial of short-term disability benefits. 450 F.3d at 254. The Sixth Circuit remanded the case for a full and fair review of the disability claim where an administrator's peer-review doctor never consulted with the insured's primary provider, never fully reviewed the insured's job description, and the court was unable to determine whether the administrator artificially altered medical records for review. <u>Id.</u> at 261-64. Similar facts are not present here.

evaluation in addition to Dr. Young's review – and that decision was reasonable. Sedgwick used a deliberate, principled, and reasoned decision-making process in denying Jones's request for continued short-term disability benefits. It was a decision supported by substantial evidence, and it was a decision the STD Plan allowed Sedgwick to make in its sole discretion.

**IV.** <u>**CONCLUSION**</u>

For the reasons stated herein, **IT IS THEREFORE ORDERED** that Plaintiff's Motion for Judgment, (Doc. 22), is **DENIED,** that Defendant's Motion for Summary Judgment, (Doc. 23), is **GRANTED**, and that this case is **DISMISSED**.

A judgment in accordance with this Memorandum Opinion and Order will be entered contemporaneously herewith.

This the 28th day of March, 2019.

_____
United States District Judge